IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 25, 2005 Session

**STATE OF TENNESSEE v. CHARLES DRAKE**

**Appeal from the Criminal Court for Knox County**
**No. 72795     Ray L. Jenkins, Judge**

**No. E2004-00247-CCA-R3-CD - Filed June 6, 2005**

The defendant, Charles Drake, stands convicted of aggravated assault with a deadly weapon and DUI. For the aggravated assault conviction, the trial court sentenced the defendant to four years, split confinement with supervised probation after service of six months' confinement. For the DUI conviction, the trial court imposed a sentence of 11 months and 29 days with a release eligibility at 75 percent. On appeal, the defendant asserts (1) that the evidence is insufficient to support his conviction of aggravated assault; (2) that the trial court committed reversible error in prohibiting the defense from presenting to the jury an animation of the automobile collision giving rise to the charges against the defendant; (3) that the trial court committed reversible error in admitting the results of a blood toxicology test; and (4) that his sentence is excessive. After thoroughly reviewing the record and applicable authorities, we find sufficient evidence to support the conviction, no error in the admission or exclusion of evidence at trial, and appropriate sentencing. We, therefore, affirm the convictions and sentences.

**Tenn. R. App. P. 3; Judgments of the Criminal Court are Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Patrick T. Phillips, Knoxville, Tennessee; and Tommy Hindman, Knoxville, Tennessee, for the Appellant, Charles Drake.

Paul G. Summers, Attorney General & Reporter; John H. Bledsoe, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Zane Scarlett, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

A tragic two-car automobile accident gives rise to this appeal. The head-on collision occurred shortly after 1:30 a.m. on August 17, 2000, in Knox County. The accident scene was on Pleasant Ridge Road, near the intersection of Deerfield Subdivision. Patricia Burke, who was driving a 1989 Chevrolet Astro minivan, died as a result of the accident. The passenger in Ms. Burke's vehicle, Gordon Wright, sustained several cracked ribs, torn ligaments on his right shoulder, a broken nose and finger, and multiple lacerations; this 63-year-old victim was hospitalized for 18 days and had been unable to work since the accident. The 21-year-old defendant was operating a Toyota pickup truck, and he sustained internal injuries, facial cuts requiring suturing, and a broken collar bone and nose for which he was hospitalized seven to eights days.

The defendant, who testified at trial, admitted that he had been drinking earlier in the evening, and he agreed that tests showed his blood alcohol level to be .19 percent. The theory of defense was that the defendant's intoxication did not cause the wreck; rather, at the point of collision, both vehicles were in the middle of the road and not in their designated lanes of traffic. The defense called two expert witnesses to corroborate the theory of defense. FBI Special Agent David Goldkoph, who was an officer and accident investigator with the Knoxville Police Department at the time of the accident, opined that each vehicle was in the wrong lane of traffic and that the point of impact was approximately the center of the roadway. Motor vehicle accident reconstructionist, Bobby Jones, who serves as a part-time Assistant Chief Deputy with the Knox County Sheriff's Department, independently verified Agent Goldkoph's conclusions and so testified.

The defendant went to trial facing seven charges: vehicular homicide by intoxication involving Ms. Burke's death (Count 1); vehicular homicide by reckless conduct involving Ms. Burke's death (Count 2); vehicular assault involving Mr. Wright (Count 3); aggravated assault causing bodily injury to Mr. Wright (Count 4); aggravated assault by deadly weapon against Mr. Wright (Count 5); DUI per se (Count 6); and DUI by intoxication (Count 7). The jury returned not-guilty verdicts on Counts 1 and 2, which charged vehicular homicide of Ms. Burke, and it found the defendant guilty of the remaining offenses. The trial court merged the convictions on Counts 3, 4, and 5 into a single conviction count for Class D aggravated assault and sentenced the defendant to a term of four years as a standard, Range I offender. On Counts 6 and 7, the court ordered service of 11 months and 29 days at 75 percent. As to the merged aggravated assault sentence, the court imposed split confinement, with six months service in custody and the remainder of the term on probation.

At the outset, we note that our appellate review has been facilitated greatly by the parties' skillful and professional advocacy at trial and by the thoughtful presentations and arguments on appeal.

## I. Sufficiency of the Evidence

Inasmuch as the defendant assails the sufficiency of the convicting evidence, we begin with an overview of the testimony and evidence at trial, taken in the light most favorable to the state. *See State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The injured passenger, Gordon Wright, was the state's lead witness. Mr. Wright explained that he and the deceased driver, Ms. Burke, had been living together for six years. They resided at 4713 Miller Road, approximately one mile from Pleasant Ridge Road. Mr. Wright had never been licensed to drive because of eye problems related to corneal implants that he received when he was much younger. As a result, Mr. Wright depended on Ms. Burke to provide transportation to and from his place of employment at Kerns Bakery.

Mr. Wright testified that he worked the early morning shift, and on the day of the accident, he and Ms. Burke left their residence around 1:00 a.m. Along the way, the pair stopped at a convenience store, the Bread Box, on Pleasant Ridge Road, where Mr. Wright bought a pack of cigarettes. Mr. Wright estimated that the Bread Box was a quarter of a mile from the accident scene. After the stop, they re-entered Pleasant Ridge Road and encountered no other traffic at the time. Mr. Wright said that he saw a light as they approached the intersection at Deerfield Subdivision, where the road narrowed to two lanes. Mr. Wright gave varying descriptions of the light. On direct examination, he maintained that he could not distinctly identify the type of light. He could tell that the light was heading toward him, and he stated, "It was flashing back – like it was flashing back and forth, and I didn't know whether it was a caution light or what." He added that he thought the light was related to the Deerfield Park Subdivision. Later, in his direct examination testimony, Mr. Wright said that "it looked to [him] like [an oncoming vehicle] was – he was in the ditch line [on the van's side of the road] coming to [them]."

Mr. Wright recalled the impact occurring at the subdivision intersection, after which he remembered little else other than attempting to remove Ms. Burke from the van and being transported to the hospital by ambulance. He insisted that he and Ms. Burke were in their proper lane of traffic when the two vehicles collided, and he estimated their speed to be between 30 to 35 miles per hour.

On cross-examination, Mr. Wright agreed that Pleasant Ridge Road is slightly inclined where it approaches the Deerfield Park Subdivision and that drivers traveling in both directions would encounter a "blind hill" at that location. Mr. Wright denied, however, telling the defense investigator that what he saw was "regular flashing lights," and he disclaimed saying" that the lights indicated to him that road work was ongoing. He also denied telling an insurance agent, who was investigating the collision, that the van in which he was riding was "all the way up against the curb when the cars hit head-on." Regarding his vision problems, Mr. Wright testified that it takes his eyes longer to adjust and recover when lights shine in his eyes. He conceded that the lights from an oncoming vehicle about to collide head-on with the van would have blinded him, but he thought that the lights could have been hitting the van without hitting him directly in his eyes.

The first Knoxville police officer dispatched to the accident scene was Jeff Damewood. An emergency medical team was at the scene when he arrived, and the roadway was blocked by two vehicles. He testified that the location of the van was near the fog line on

-3-

the northbound side near the grass, and the truck sat perpendicular to the roadway in the intersection where Deercreek Park Road intersected Pleasant Ridge Road. Officer Damewood related that he first checked on the medical condition of all involved motorists. He then obtained driver's licenses and found out to which hospital the motorists would be transported.

Officer Damewood testified that he stayed near the defendant and his truck because he could smell "a strong odor of alcohol." After the defendant left the scene by ambulance, Officer Damewood then remained briefly to ensure that other officers who had arrived would have the damaged vehicles towed and would clean up the roadway. Officer Damewood then drove to the hospital and inquired of hospital staff about the medical condition of the motorists. He learned that Ms. Burke died during surgery and that Mr. Wright had been taken to surgery. He located the defendant lying on a gurney in the emergency room hallway.

Officer Damewood explained that upon learning of Ms. Burke's death, he called his supervisor to report the fatality so that the supervisor could designate a fatal accident investigator reconstructionist to head up the investigation. The supervisor designated Officer David Goldkoph, who was on duty and had stopped by the scene earlier to observe what had happened, although he did not "work the accident."

After contacting his supervisor, Officer Damewood remained at the hospital and began filling out an accident report. He notified hospital personnel that he would need blood drawn from the defendant. The blood was drawn at approximately 4:00 a.m., and the blood vial was turned over to Officer Damewood who inserted it into a blood kit developed specifically by the TBI for law enforcement requests to test blood samples. Officer Damewood stayed with the defendant until the defendant was removed from the hallway and taken for treatment. Officer Damewood described the defendant as being either asleep or passed out while in the hallway, and at one point, the defendant vomited on the hallway floor. Officer Damewood testified that the vomitus had a strong smell of alcohol.

On cross-examination, defense counsel reviewed the accident report with the officer. The report inaccurately stated that the officer took statements from the driver and passenger of the van. The officer did agree, as reflected in his report, that the defendant told him that he was in his own lane of travel going northbound. In reviewing photographs of the accident scene, Officer Damewood, who was not an accident reconstructionist, admitted that the final resting place of the vehicles did not reveal the position of the vehicles on the roadway at the time of collision.

The defense called eight witnesses, including the defendant and two character witnesses. The testimony of character witnesses, Mike Friend and Craig Rigel, was brief. Both men said that the defendant had a good reputation and was entitled to be believed under oath.

The defendant took the stand and testified that he was 21-years old at the time of the accident, and he was beginning his fall semester at the University of Tennessee, where he later graduated with a degree in horticulture and landscape design. Leading up to the accident, the defendant related that he left his house, near Pleasant Ridge Road, late in the evening of

August 17, to meet friends at O'Charley's restaurant on the "strip." He drank while at the restaurant and stayed approximately one and one-half to two hours. When he left, he took back roads to get home because of construction on the interstate.

The defendant admitted to the jury that he had been drinking before the accident, and he expressed remorse and feeling "horrible" about what had happened. In terms of what he remembered about the drive, the defendant recalled driving down Pleasant Ridge Road because he wanted to buy gas at the Bread Box before he went to work in the morning. He saw an approaching vehicle, and as it crested the hill, the defendant realized that it was in his lane of travel. Everything happened quickly, and the defendant said that he did "anything [he] could to slam on the brakes to avoid the accident."

On cross-examination, the defendant estimated that he drank five or six beers at O'Charley's. He denied choosing a back-road way home to decrease his chances of being stopped. The defendant explained that "the last thing [he] remember[ed] before the crash was seeing the oncoming headlights in [his] lane and then [trying] to make an evasive maneuver to get out of the way, slammed on the brakes, and was unsuccessful." Regarding his speed, the defendant believed that he was somewhat over the speed limit, but he also considered himself to be in control of his vehicle.

Mike Burchett, an insurance adjuster with Appalachian Claims Service, testified that his company – the defendant's insurer – instructed him to investigate the accident. Mr. Burchett interviewed Mr. Wright at the hospital. Mr. Wright related that when he first saw the defendant's vehicle, it appeared to be "sideways." Mr. Wright was uncertain at the time about which lane the defendant's vehicle was in, but Mr. Wright thought his vehicle was "up against the curb" in the proper traffic lane at the time of impact. Mr. Burchett said that Mr. Wright estimated that Ms. Burke was driving at a high rate of speed.

Kim Knight, a private investigator hired by the defense, testified that he also spoke with Mr. Wright and recorded the interview. Mr. Wright told Mr. Knight that he believed the flashing lights indicated the presence of road construction. Mr. Wright first identified the lights as being yellow but then changed his mind and expressed uncertainty. On cross-examination, the state referred Mr. Knight to other portions of the transcribed interview wherein Mr. Wright said that what he saw was regular flashing headlights coming at him. Mr. Knight responded that over the course of the interview, Mr. Wright provided multiple scenarios of what he saw and what happened.

Through Lieutenant Vincent Ayub, the Knoxville Police Department Records Supervisor, the defense introduced for identification the accident reconstruction report and investigation materials relating to the collision. The defense then called former Knoxville Police Officer David Goldkoph, who at the time of trial was a Special Agent with the Federal Bureau of Investigation.

Agent Goldkoph testified that he was not dispatched to the accident scene. He heard about the accident on the police radio and responded on his own initiative. Later that

morning, after Ms. Burke died, he was assigned to head up the investigation as the accident reconstructionist. He closed off the road and took measurements of the roadway and other physical evidence, such as surface scrapes and skid marks. He also reviewed photographs taken at the scene showing the final resting place of the vehicles. Ms. Burke's van came to rest facing southbound in the northbound lane of traffic; the defendant's truck was facing east across the northbound lane of traffic. From the evidence, Agent Goldkoph concluded that "both vehicles were coming from the wrong side of the road, that being the van heading south in the northbound lane of traffic, and the pickup truck heading north in the southbound lane of traffic, at which time they struck nearly head-on approximately in the center of the roadway."

The most lengthy and detailed testimony came from Bobby Jones, Jr., an accident reconstruction expert hired by the defense. The state made no objections to the witness's qualifications, which included: (a) training and certification as an accident investigator by the National Highway Traffic Safety Administration, (b) employment by the United States Department of Transportation in the National Accident Sampling System program, (c) accreditation by the Accident Reconstruction Commission, (d) teaching accident reconstruction throughout the United States, (e) a teaching position at Auburn University College of Engineering, (f) certification as a computer integrated drafting technician and in the area of computer animation, and (g) training forensic scientists and crime scene technicians about laser mapping. At the time of his testimony, Mr. Jones also served as a part-time Assistant Chief Deputy with the Knox County Sheriff's Department.

As part of his investigation, Mr. Jones reviewed all of the police photographs and physical measurements at the scene. He testified that he relied upon the physical measurements taken by Agent Goldkoph and, additionally, verified for himself the information. Mr. Jones explained that he was able to do so because the gouge marks shown in the police photographs were still evident at the accident scene. Mr. Jones testified that he was not initially privy to Agent Goldkoph's conclusions; only after Mr. Jones reached his own, independent conclusions did the defense provide him with a copy of Agent Goldkoph's reconstruction summary.

Mr. Jones explained that he visited the accident site both during daylight and night time hours. He took measurements and photographs and located the gouge marks. At night, he collected three-dimensional data, such as the lay of the land and the hill crest near the accident site. Night time photographs showed a slight upgrade in the road and a hill crest in the defendant's path of travel; the roadway also curved to the right. In Ms. Burke's path of travel, the roadway curved to the left as it rose to the hill crest.

Mr. Jones next imported photographs of the vehicles into a computer program to scale the vehicles, measure the direct contact damage, and determine the damage patterns on both vehicles to determine how the vehicles collided. He concluded that the vehicles hit passenger side to passenger side in a head-on type collision. The 16-foot skid mark at the accident scene came from the right front tire on the defendant's truck, and given the center of mass of the truck and its final resting place, Mr. Jones believed that there was some "steering input" maneuver before the truck brakes were engaged. He found no evidence that the van made any last-minute maneuvers or that the driver applied the brakes before impact.

From available information and applying accepted formulas relating to the co-efficient of friction and conservation of momentum, Mr. Jones was also able to calculate the speed of the vehicles just before impact. He testified that the pre-impact speed of Ms. Burke's van was 27 miles per hour, and the pre-impact speed of the defendant's truck, after laying down a 16-foot skid mark, was 46 miles per hour. The posted speed limit on Pleasant Ridge Road was 40 miles per hour. Finally, Mr. Jones testified that his analysis revealed that at the time of collision, both vehicles were in the center of the road.

After hearing this evidence, the jury convicted the defendant of five counts, which the trial court merged to reflect one aggravated assault conviction and one DUI conviction. The defendant challenges the sufficiency of the evidence introduced at trial to support these two merged convictions.

Our evidence-sufficiency review is conducted pursuant to well-settled principles. When an accused challenges the sufficiency of the evidence, an appellate court inspects the evidentiary landscape, including the direct and circumstantial contours, from the vantage point most agreeable to the prosecution. The reviewing court then decides whether the evidence and the inferences that flow therefrom permit any rational fact finder to conclude beyond a reasonable doubt that the defendant is guilty of the charged crime. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn. 1985); *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).

In determining sufficiency of the proof, the appellate court does not replay and reweigh the evidence. *See State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Witness credibility, the weight and value of the evidence, and factual disputes are entrusted to the finder of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). Simply stated, the reviewing court will not substitute its judgment for that of the trier of fact. Instead, the court extends to the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences that may be drawn from the evidence. *See Cabbage*, 571 S.W.2d at 835.

The defendant challenges his aggravated assault conviction on the basis that the evidence does not show beyond a reasonable doubt that his actions were the proximate cause of Mr. Wright's injuries. In support of this contention, the defendant points to the jury's not-guilty verdicts on the vehicular homicide charges involving Ms. Burke's death. He also insists that the physical evidence is inconsistent with Mr. Wright's account and that Mr. Wright's testimony, therefore, should be disregarded. From that premise, the defendant argues that he was faced with a sudden emergency and took reasonable and evasive action under the circumstances.

Regarding the not-guilty verdicts, "[t]he rendering of inconsistent verdicts has always been an exclusive privilege and prerogative of the jury, and it is not [a reviewing court's] duty to unravel the ratiocinations of the jury's collective logic." *Jackson v. State*, 477 S.W.2d

213, 216 (Tenn. Crim. App. 1971). As the supreme court explained in *Wiggins v. State*, 498 S.W.2d 92 (Tenn. 1973),

> Consistency in verdicts for multiple count indictments is unnecessary as each count is a separate indictment. Therein lies the essential reasoning. An acquittal on one count cannot be considered res judicata to another count even though both counts stem from the same criminal transaction. This Court will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned.

*Id*. at 93-94. The defendant's argument, consequently, gains no momentum on that basis.

As for disregarding Mr. Wright's testimony, we are not persuaded that this case merits application of the "physical facts rule." The "physical facts rule" has been variously explained as: "the accepted proposition that in cases where the testimony of a witness is entirely irreconcilable with the physical evidence, the testimony can be disregarded," *State v. Hornsby*, 858 S.W.2d 892, 894 (Tenn. 1993); when "the testimony of a witness 'cannot possibly be true, is inherently unbelievable, or is opposed to natural laws,' courts can declare the testimony incredible as a matter of law and decline to consider it," *id*. (quoting *United States v. Narciso*, 446 F. Supp. 252, 282 (E.D. Mich. 1977)); and when "'undisputed physical facts are entirely inconsistent with and opposed to testimony . . . the physical facts must control,'" *id*. (quoting *Wood v. United States*, 342 F.2d 708, 713 (8th Cir. 1965)). A high threshold, however, must first be surmounted to apply the rule. "We caution," wrote the supreme court in *Hornsby*, "that the power to disregard oral testimony because of its inherent lack of believability is one that should be used sparingly." The court continued,

> Only when the testimony is inherently improbable and impossible of belief should courts intervene to declare it incredible as a matter of law. When the testimony is capable of different interpretations, the matter should be left for the jury to decide as the sole arbiter of credibility. Deciding whether there are inconsistencies in testimony, reconciling conflicts in testimony, and how this might affect a witness's credibility, are all within the province of the jury. As the court observed in *Smith v. Steele*, 44 Tenn. App. 238, 313 S.W.2d 495 (1956), "[t]he improbability of the truth of the testimony, which justifies rejection under the physical facts rule, cannot rest upon any theory involving the consideration of the comparative credibility of the witnesses." *Smith* at 508.

*Hornsby*, 858 S.W.2d at 895-96 (citations omitted).

The facts in *Hornsby* serve as an apt example why we should be loath to invoke the rule in this case. In that case, there were two eyewitness motorists to an accident that

occurred in an intersection. Both witnesses said that the defendant was driving north on Airways Boulevard and that the victim was driving east on Winchester Road. *Id.* at 896. The defendant ran a red light at the intersection and struck the victim's car. *Id.* Contrary to the witnesses' testimony, a police officer who responded to the accident scene concluded, based on gouge marks in the pavement and the damage to the vehicles, that the defendant, not the victim, was traveling east on Winchester and that the victim, not the defendant, approached the intersection on Airways while traveling north. *Id.*

The supreme court declined, under those circumstances, to apply the physical facts rule. The court emphasized that it could "hardly be said that the testimony of the two eyewitnesses [was] so improbable as to amount to facts or events that the witnesses physically could not have observed or events that could not have occurred under the laws of nature." *Id.* at 897; *see also State v. Radley*, 29 S.W.3d 532, 535 n.4 (Tenn. Crim. App. 1999) (declining to apply physical facts "because its application would be dependent upon assumptions or calculations in the determination of distance").

In this case, the defendant testified that as the van came over the hill, he saw that it was in his lane. He maintained that "the last thing [he] remember[ed] before the crash was seeing the oncoming headlights in [his] lane." Mr. Wright testified that as he and Ms. Burke approached the Deerfield Subdivision, he could see a light flashing or waving back and forth, coming toward them in an erratic fashion. He insisted that the vehicle was swerving and approaching them head-on in their lane. Agent Goldkoph testified that the accident versions he obtained from the defendant and Mr. Wright were consistent with that testimony. Agent Goldkoph saw nothing at the accident scene that directly contradicted or supported Mr. Wright's statements.

The defendant points out that both Agent Goldkoph and Mr. Jones determined that the place of impact was in the center of the roadway and that both vehicles were outside of the assigned lanes of travel. As a result, the defendant argues that Mr. Wright's testimony conflicts with the physical facts. We disagree. Mr. Wright's belief – mistaken as it may have been – that the van was "up against the curb" in the proper traffic lane *at the time of impact* is not dispositive of how the vehicles were being driven before the impact. The defendant asserts that the record is devoid of evidence that the defendant's actions preceding the collision were "in any manner unreasonable or negligent much less criminal." This assertion overlooks the evidence in the record that the defendant was operating his truck in excess of the posted speed limit, in violation of Code section 55-8-153(e), that he was operating a motor vehicle while the alcohol concentration in his blood was greater than .10 percent, in violation of Code section 55-10-401(a)(2), that he was operating a motor vehicle while under the influence of an intoxicant, in violation of Code section 55-10-401(a)(1), *see* Tenn. Code Ann. §§ 55-8-153(e), -10-401(a)(1), -10-401(a)(2) (1997), and that Mr. Wright testified to seeing a light flashing or waving back and forth, coming toward them in an erratic fashion before the impact.

It was the jury's province to determine which parts of the testimony and evidence to credit, inasmuch as there is no requirement that a jury must wholly accept or reject a witness's account of events. *See State v. Bolin*, 922 S.W.2d 870, 876 (Tenn. 1996). It was up to the jury

to determine the believability of the defendant's testimony that as the van came over the hill, it was in his lane of travel as opposed to Mr. Wright's testimony that the defendant's vehicle was swerving and traveling in the van's lane. It was also up to the jury to evaluate the effect of the defendant's admitted intoxication, .19 percent, and his excessive rate of speed on his ability to operate his vehicle. In our view, a rational jury could logically conclude that instead of being a victim faced with a sudden emergency, the defendant's intoxication and excessive speed precipitated the emergency leading to the vehicles colliding in the center of the road. Thus, we decline to apply the physical facts rule to Mr. Wright's testimony.

Last, we address the defendant's argument that the evidence is insufficient to prove beyond a reasonable doubt that the defendant's actions were the proximate cause of Mr. Wright's injuries. It is settled that "a wrongdoer cannot escape liability for a criminal act just because the criminal act of another contributed to produce the prohibited consequence." *State v. Baggett*, 836 S.W.2d 593, 595 (Tenn. Crim. App. 1992). "Thus, one whose wrongdoing is a concurrent proximate cause of an injury may be criminally liable the same as if his wrongdoing [was] the sole proximate cause of the injury." *Id*; *see State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001) (concluding that causation in criminal cases is generally a question of fact for the jury, that a victim's contributory negligence is not a complete defense but may be considered as it relates to whether a defendant's conduct was a proximate cause, and that a jury's determination of causation will be reviewed under traditional sufficiency of the evidence standard).

In our opinion, a rational jury could conclude from the evidence that the victim was driving southbound on Pleasant Ridge Road, well under the posted speed limit, and the defendant was driving northbound on Pleasant Ridge Road, traveling 46 miles per hour in a 40-miles-per-hour zone while under the influence of alcohol. Even if the jury believed that both vehicles were outside their designated lanes of travel as they crested the hill and navigated the curve in the road, Ms. Burke's conduct does not exonerate the defendant but instead constitutes a concurrent proximate cause.

Accordingly, for the foregoing reasons, we reject the defendant's evidence insufficiency claim.

## II.  Computer Visualization of the Automobile Collision

In his next issue, the defendant complains that the trial court erroneously excluded computer generated evidence that Mr. Jones had created regarding the collision. At the outset we note that the parties seem to dispute the basis for the trial court's ruling. The defendant seeks to limit the evidentiary ruling to the issue whether the evidence was redundant or cumulative. The state quotes the trial court's statement that the evidence had "great potential to mislead the jury."

Our review of the record reveals that after Mr. Jones's detailed testimony, the defense moved to allow the witness to play a video animation relative to how the collision occurred and offered to lay a foundation before introducing the video. The state interjected, "I just think it's redundant. I think that he's explained his conclusions." The defense responded that the material was not redundant and solicited the trial court to "indulge" the defense even if the material was somewhat redundant.

The trial court excused the jury, and the defense argued that the video would only take about five minutes to play and that it would assist the jury. Pointing out that the law conditions admissibility on the evidence being a fair and accurate depiction of the event that it portrays, the state argued that "all this expert has been able to tell us is . . . the point of impact," that "this animation goes far beyond that," and that "there is nothing to lay the foundation for what happened before that point of impact." The defense responded in general terms that once the video was played, Mr. Jones would provide additional testimony to explain the animation.[1] The state raised the additional concern of the effect of the video in terms of danger that the jurors might accept it as an actual event.

Pursuant to the defense request for an opportunity to establish the admissibility of the video, the court allowed the defense to question Mr. Jones outside the presence of the jury. Mr. Jones testified that he had been trained and instructed others in the use of "video animation software," which allows the user to input information, such as speed, road surface, and distances traveled to generate images. Regarding accuracy, he said that he used the information that he derived from his calculations and the measurements taken at the accident scene.

The state's examination of Mr. Jones was more revealing. When asked if anything appeared on the animation about which he had not already testified, Mr. Jones responded affirmatively that the animation included the "pre-impact paths of travel" going back approximately 250 feet for each vehicle. When asked the source of the information used, Mr. Jones responded in general terms that "the information is calculated, based upon the pre-impact movement through physics." The state pressed, "So you created this – all you really know is the point of impact and the speed at impact; is that right?" Mr. Jones replied, "We know the point of impact, the speed of impact that is calculated. Yes. sir." Thereafter the trial court sustained the state's objection to admitting the evidence, ruling that "it ha[d] a great potential to mislead the jury."

We note that when Mr. Jones resumed testifying before the jury, the state's cross-examination further clarified his opinions. Mr. Jones agreed with the state that at the time of impact the defendant's truck was further over in the wrong lane of travel than was the van. He

---

[1] According to the discussion between the parties, as appears in the transcript, the animation consists of three accident scenarios. The first scenario illustrated the path of travel of the vehicles from impact to final resting place. The second scenario projected how the collision would have happened if Ms. Burke had been driving the van in the defendant's lane of travel prior to impact. The last scenario then projected how the accident would have occurred if the van had been in its proper lane of travel. The appellate record contains a DVD-R disc, marked Exhibit 19 for Identification, which corresponds to the computer-generated animation offered by the defense. Unfortunately, we have been unable to review the exhibit because the disc was cracked when this panel received the record. Even so, we believe that the appellate record is otherwise adequate to consider and rule upon the defendant's assertion of evidentiary error.

also agreed that from the evidence at the scene, the defendant was not obeying all posted traffic laws. Finally, Mr. Jones conceded that he did not know what precipitated the vehicles colliding in the center of the road.

The leading case on computer generated evidence is *Farner*. In that case, the court distinguished a computer "animation" from a computer "simulation."

> If the purpose of the computer evidence is to illustrate and explain a witness's testimony, courts usually refer to the evidence as an animation. . . . In contrast, a simulation is based on scientific or physical principles and data entered into a computer, which is programmed to analyze the data and draw a conclusion from it, and courts generally require proof to show the validity of the science before the simulation evidence is admitted.

*Id*. at 208.

In the computer animation context, the proponent must "establish that the computer animation is a fair and accurate depiction of the event it purports to portray." *Id*. at 209. "Because the jury may be so persuaded by [the animation's] life-like nature that it becomes unable to visualize an opposing or differing version of the event, the requirement that the animation fairly and accurately portray the event is particularly important when the evidence at issue is a computer animated recreation of an event." *Id*.

Furthermore, as with all evidence, the material is subject to exclusion if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *See* Tenn. R. Evid. 403. As the *Farner* court explained,

> If a computer animated portrayal is inaccurate, its probative value decreases and the likelihood that it will be subject to exclusion under Rule 403 increases. Like other evidence, the admissibility of computer animations generally rests within the sound discretion of the trial court, with the rules of evidence governing the exercise of the trial court's discretion.

66 S.W.3d at 209.

In this case, we are not prepared to condemn the trial court's exclusion of the computer visualization evidence as an abuse of discretion. We are troubled by Mr. Jones's jury-out explanation that the animation included the "pre-impact paths of travel" going back approximately 250 feet for each vehicle, when he later conceded that he did not know what caused the collision and could accurately determine only the point of impact and the speed at impact. By the testimony of the defendant's own expert, the computer visualization, if an animation, does not qualify as a fair and accurate depiction of the event it purports to portray.

*See id.* at 209-10 (pointing out critical deficiencies in the accuracy of the animation; although officer was unable to make a speed determination for defendant's vehicle, the animation depicted the vehicle at various speeds throughout the animation).

Another troubling aspect about the computer visualization involves the different accident scenarios projecting how the collision would have happened if Ms. Burke had been driving the van in the defendant's lane of travel prior to impact and how the collision would have occurred if the van had been in its proper lane of travel. These prediction-based scenarios strike us as more akin to a computer "simulation," and the defense in its appellate brief even refers to parts of the computer visualization as capable of being characterized as a simulation. A simulation, however, requires much more specific foundational proof "to show the validity of the science before the simulation evidence is admitted." *Id.* at 208. No such foundation was laid in this case. Although the defense claims that it was not afforded the opportunity to establish such a foundation, we note that the trial court conducted a jury-out hearing for the defense to offer whatever it deemed appropriate to support admissibility of Mr. Jones's computer visualization.

In summary, we find no abuse of discretion in the exclusion of the computer visualization in this case, and we regard the trial court's concerns that the evidence had great potential to mislead the jury as well founded.

### III. Admissibility of Blood Toxicology Test Results

In his next issue, the defendant contends that the trial court erred in admitting test results derived from a blood sample taken after he was transported to the hospital. To support this claim, the defendant challenges the adequacy of the chain of custody, the hearsay nature of the evidence, and the Confrontation Clause implications of admitting the evidence. This issue was litigated pretrial and raised in the defendant's motion for new trial. In his brief, the defendant also encourages this court to "use it[s] interpretive power to read in a rational and implicit exclusionary rule" into Code section 55-10-406(a)(1) when the state fails to prove the professional credentials of the individual who drew the blood.

The evidence at the pretrial suppression hearing showed that Officer Damewood asked the hospital staff to draw blood from the defendant. Officer Damewood was present and watched the sample as it was drawn by Rick Stewart, a hospital employee. Officer Damewood did not personally know Mr. Stewart, and the officer could not recall the specific details of how the blood was drawn. Mr. Stewart gave the blood vial to Officer Damewood who secured Mr. Stewart's signature on the toxicology report that accompanied the standard TBI toxicology kit. Mr. Stewart did not testify at the suppression hearing or at trial.

Officer Damewood, the proof showed, placed his paperwork and the blood vial in the toxicology kit, sealed the box, and delivered the box to the Knoxville Police Department Evidence Lab. Because the kit was being deposited outside normal business hours, Officer Damewood explained that the procedure was to insert the kit through a small opening on the front of a locked and sealed refrigerated cooler and to note on a log sheet when the specimen was placed in the cooler.

-13-

The specimen was later removed from the cooler and logged in by a property unit employee who also checked the specimen, assigned it a bar code, and transported it to the laboratory. As of August 17, 2000, the property unit employee would have been Officer Whitson. Officer Whitson did not testify at the hearing or at trial, but the state offered the testimony of Officer Kelvin Reed, the present property unit officer. Officer Reed identified and offered as a business record the master log of refrigeration showing that Officer Whitson checked the blood specimen out of evidence on August 18 when he delivered it to the TBI laboratory in Knoxville.

Dora Stalains, a forensic technician with the TBI, received the blood specimen from Officer Whitson on August 18. She testified that she knew Officer Whitson personally and that the kit she received from him was in a sealed condition. Ms. Stalains recorded the date and time of receipt and placed the kit in a refrigerator in a sealed vault in the laboratory. Melena Jenkins, another TBI forensic technician, retrieved the sealed kit from the vault, assigned a laboratory number to the blood tube, filled out the required paperwork, placed the tube in the "blood rack", and returned the specimen to the vault for later analysis. The next person in the chain of custody was the chemist who analyzed the specimen, and the state explained at the hearing that the chemist was testifying in another case and was unavailable at that time. At trial, TBI Special Agent Dave Ferguson, who analyzed the specimen, did testify and reported the .19 percent test results.

## A. Chain of Custody

Preliminarily, we point out that the defendant does not attack the chain of custody of the blood sample as a means of excluding the blood sample from evidence; rather, he seeks to suppress the toxicology report that was based upon the blood sample. With that in mind, we examine the chain of custody issue.

The defendant targets the absence of Mr. Stewart, who drew the blood, and of Officer Whitson, who delivered the blood to the TBI laboratory, as fatal to the state's chain of custody. As we shall explain, we disagree.

Evidence Rule 901(a) requires that evidence be authenticated or identified as a condition precedent to its admissibility. Tenn. R. Evid. 901(a). For tangible evidence, "a witness must be able to identify the evidence or establish an unbroken chain of custody." *State v. Kilpatrick*, 52 S.W.3d 81, 87 (Tenn. Crim. App. 2000). The purpose of this requirement is to "demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence." *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993). Absolute certainty of identification is not required, however. *See Kilpatrick*, 52 S.W.3d at 87. "Reasonable assurance, rather than absolute assurance, is the prerequisite for admission." *Id.* The issue addresses itself to the sound discretion of the trial judge, whose ruling will not be disturbed absent a clear abuse of that discretion. *See id.*; *State v. Beech*, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987); *State v. Johnson*, 705 S.W.2d 681, 684 (Tenn. Crim. App. 1985); *Wade v. State*, 529 S.W.2d 739, 742 (Tenn. Crim. App. 1975).

In terms of chain of custody, the facts of this case are similar to those in *State v. Dean*, 76 S.W.3d 352 (Tenn. Crim. App. 2001). That case involved blood samples subjected to DNA analysis. The blood samples were obtained, pursuant to a search warrant, and the defendant's blood was drawn by an employee with the Memphis Sexual Assault Resource Center. *Id*. at 366. As in this case, the person who drew the blood did not testify. A police sergeant who was present when the blood was drawn did, however, testify, as did a forensic nurse examiner at the resource center. *Id*. at 366-69. Testifying from resource center records, the nurse examiner identified the employee, since retired, who drew the blood and who delivered it to another resource center employee. The nurse examiner also explained the procedures for labeling, handling, and storage of the sample. *Id*. at 366-67. From the resource center, the sample traveled to the TBI laboratory in Jackson and then to the Nashville TBI laboratory. The TBI individuals in Jackson and Nashville who handled the sample testified in support of the chain of custody. *Id*. at 367.

The court rejected Dean's chain of custody objection.

> [B]ased upon the proof presented, we conclude that the "circumstances surrounding the evidence reasonably establish the identity of the evidence and its integrity." Although the defendant stressed at trial and on appeal possibilities of tampering and contamination, there was no showing that this occurred. Rather, the State presented minimal but adequate "proof that the evidence was handled according to normal procedures and that there [was] no indicia of tampering."

*Id*. at 370 (citations omitted).

In the case before us, we are likewise convinced that the state submitted adequate chain of custody proof and that the trial court did not abuse its discretion in admitting the evidence. We consider it significant that Officer Damewood, who witnessed the sample being taken and who directly received it from Mr. Stewart, did testify. Admittedly, Officer Whitson, who transported the sample from the Knoxville Police Department Evidence Lab to the TBI laboratory, did not testify; Officer Reed explained during his testimony that Officer Whitson was retired and had some serious medical problem. Nonetheless, the TBI forensic technician who received the sample did testify. Ms. Stalains knew Officer Whitson and identified him as the individual from whom she received the sample. Her testimony was *unequivocal* that the kit she received was sealed. *See State v. Charles Raymond Sanders*, No. M2000-03083-CCA-R3-CD, slip op. at 15-16 (Tenn. Crim. App., Nashville, Aug. 30, 2002) (chain of custody established when samples from victim were stored in cooler in the autopsy suite, access to building was controlled, and seal on tubes showed no signs of tampering; chain of custody also shown for defendant's blood sample that was stored overnight in detective's refrigerator at home because even though detective did not guard refrigerator, he was present the entire time, refrigerator was located inside private residence, and sample appeared intact with no signs of tampering).

-15-

We have considered the defendant's argument that Officer Reed could not state with absolute certainty that the evidence handling procedures used in August 2000 were identical to those he used, but that uncertainty in our opinion, without more, does not undermine the sufficiency of the chain of custody. *See State v. Goad*, 692 S.W.2d 32, 36 (Tenn. Crim. App. 1985) (failure of police property room custodian to testify did not interrupt chain of custody or render evidence inadmissible); *State v. Coury*, 697 S.W.2d 373, 378 (Tenn. Crim. App. 1985) (defendant's clothing admissible even though testimony unclear regarding which officer placed the evidence in the suitcase). Under these circumstances, we find that the integrity of the evidence was adequately shown.

## B. Hearsay

Next, the defendant assails the admissibility of the refrigerator log sheet bearing Officer Whitson's name and the date, August 18, when he removed the evidence to transport it to the TBI laboratory. He argues that no proper foundation was established to admit the log sheet as a business record because Officer Reed lacked personal knowledge of the property unit procedures in August 2000 and because the state failed to show that the log sheet was made at or near the time of the event recorded.

How this issue arose pretrial and how it was handled by the defense during trial are significant matters in our opinion. The defense did not prevail on its pretrial attempt to suppress the results of the blood toxicology testing. During the pretrial hearing, the state presented its chain-of-custody witnesses, with the exception of Agent Ferguson, who analyzed the blood sample. Agent Ferguson did not appear at the pretrial hearing because he was engaged in testifying in another case, and we discern that the defense did not object to his absence inasmuch as he was the undisputed last link in the chain of custody.

For reasons not evident from the record, when the case went to trial, the state did not develop its chain of custody as it had during the pretrial hearing. Rather, the state elicited (a) Officer Damewood's testimony that he requested that the hospital draw the defendant's blood and that he received the blood sample and (b) Agent Ferguson's testimony regarding the results of the blood alcohol analysis that he performed. Owing to the lack of defense objection at trial, we can only surmise that subsequent to the pretrial hearing, the defense and the state struck an agreement for the state to abbreviate its chain of custody proof at trial.

Having received a clear and definitive ruling pretrial that the blood toxicology results would be admitted, we do not believe that the defendant's failure to object at trial necessarily waived the issue for appellate review. *See* Tenn. R. Evid. 103(a)(2) ("Once the court makes a definitive ruling on the record admitting to or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal."). Nevertheless, waiver becomes a consideration, in our opinion, because of the affirmative actions taken by the defense at trial. Specifically, during the state's direct examination of Agent Ferguson, the following exchange occurred:

-16-

Q	Okay. Did you perform a test on a vial of blood that was submitted to you from the Knoxville Police Department on this case?

A	I performed the analysis on one tube of blood. The subject's name was Charles Drake.

Q	Okay. What is that you were testing that blood for?

A	I was – I performed a blood alcohol analysis.

[By Defense Counsel]:	General, I have no objection to the introduction of the summary of his report showing that he registered a .19.

Q	Would you tell us the result of that test?

A	It was ethyl alcohol content of 0.19.

Q	And you prepared a report to that effect?

A	Yes.

Thereafter, when the defendant took the stand, the following testimony was elicited at the beginning of direct examination:

Q	First of all, let's get one thing out of the way. You were driving your vehicle on Pleasant Ridge Road; is that correct?

A	Yes, sir.

Q	And earlier that evening you had been drinking?

A	Yes, sir.

Q	And it has been stipulated that your blood alcohol content was a .19; is that correct?

A	Yes, sir.

Q	And you don't deny that in any way, do you?

A	No, sir.

-17-

Q     How do you feel about that, as you sit here today and look at these jurors?

A     I feel horrible about it.  It's the worst decision I ever made in my life.  And I wish I could take it back, but I can't.

It is obvious from the record that having lost the suppression issue, the defense pursued a trial strategy that the defendant's intoxication did not contribute to or cause the collision.  We discern that the defense was attempting to "gain credibility" with the jury by not denying the defendant's intoxication and focusing, instead, on causation.  Such a strategy is certainly sound, but it can be fraught with danger in terms of preserving issues for appeal.  As explained in *State v. Milburn Greene*, No. 317 (Tenn. Crim. App., Knoxville, Nov. 7, 1990),

> When the trial court ruled that the prior conviction could be used to impeach the appellant, counsel found himself on the proverbial horns of a dilemma.  He had to make the choice of (a) eliciting the prior conviction from the appellant during direct-examination or (b) requir[ing] the State to elicit the conviction during cross-examination.  Eliciting a prior conviction during direct-examination is a well-known and used defense tactic.  It serves two basic purposes:  (a) it diffuses the impact of the conviction upon the jury and (b) bolsters the credibility of the defendant since he is admitting an unfavorable part of his life.  However, when, as here, defense counsel elects to elicit the conviction during direct-examination, he waives all issues relating to the admissibility of the conviction. This is the price that an accused must pay when defense counsel invokes this strategy.

*Id*., slip op. at 6.

In the instant case, the defense sponsored at trial the results of the test that it earlier sought to suppress.  First, the defense unnecessarily interrupted the state in the midst of its examination of Agent Ferguson to announce that it did not object to the report showing .19 percent test result.  Second, in his sworn testimony, the defendant affirmed that his blood alcohol content was .19 percent and that he did not "deny that in any way."  Accordingly, we believe that the defendant has waived consideration of this issue.  *See Jordan v. State*, 467 S.W.2d 840, 841 (Tenn. Crim. App. 1971) ("[W]hen a defendant goes upon the stand and admits the truth of evidence the admissibility of which he has challenged, he waives his objection.").

Even if waiver does not defeat the defendant's claim, no inadmissible hearsay was admitted or considered.  Inasmuch as the defendant opted to litigate the admissibility of the TBI test results pretrial, the trial court was authorized to consider hearsay in making its ruling.  Evidence Rule 104(a) specifically provides that "[p]reliminary questions concerning . . . the admissibility of evidence shall be determined by the court . . . . In making its determination the

court is not bound by the rules of evidence except those with respect to privileges." Tenn. R. Evid. 104(a).[2]

Last, assuming for the sake of analysis that the admissibility of the TBI blood test report rests upon proof of a chain of custody that is established, in part, by hearsay evidence, we have no difficulty in discerning that the refrigeration log met the requirements of the exception to the hearsay rule for records of regularly conducted activity. *See* Tenn. R. Evid. 803(6). This exception provides,

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

*Id.* The propinquity of time of the refrigeration event and the log entry is assured by the fatal accident occurring on August 17 and Ms. Stalains' receipt of the evidence from Officer Whitson the next day, August 18. Ms. Stalains' testimony that she received the specimen from Officer Whitson, combined with other evidence that Officer Whitson served as the evidence officer during the relevant time frame, suggests the accuracy of the log's entries for the specimen in question on August 17 and 18. Thus, in our view, the chain of custody was not established in violation of the hearsay rule.

## *C. Confrontation*

As we understand the defendant's constitutional argument, he maintains that the admission of the blood toxicology report violated his confrontation rights because he was unable to examine Mr. Stewart, who drew the blood, and Officer Whitson, who delivered the blood to the TBI laboratory. The defendant relies primarily on the supreme court's opinion in *State v. Henderson*, 554 S.W.2d 117 (Tenn. 1997), involving the criteria that must be demonstrated to

---

[2] The Advisory Commission Comments to Rule 104 are even clearer: "Part (a) governs the fact questions to be resolved by trial courts in deciding whether a sufficient foundation has been laid. . . . This preliminary determination can be based on hearsay, because the judge should be able to separate reliable from unreliable proof." Tenn. R. Evid. 104, Advisory Comm'n Cmts.

satisfy the confrontation clause when the results of laboratory testing is admitted through hearsay testimony.

In our opinion, the defendant miscasts his argument. At trial, the blood toxicology report was admitted in connection with the testimony of TBI Special Agent Dave Ferguson. Agent Ferguson was the individual who analyzed the defendant's blood, and he testified that the test result was an ethyl alcohol content of .19 percent. Thereafter, he identified the report he prepared, and it was introduced as an exhibit to his testimony.

In contrast to how the blood toxicology report was introduced in this case, in *Henderson* drug toxicology reports were introduced through a witness other than the laboratory assistants who actually conducted the tests. In addressing the matter, the supreme court ruled that the state "cannot prove an essential element of a criminal offense by test results introduced through a witness other than the one who conducted the tests," and that "otherwise, the person charged with the offense would be denied his constitutional right to confront witnesses against him." *Id.* at 122.

Accordingly, we fail to discern how the confrontation concerns expressed in *Henderson* apply in this case to the introduction of the blood toxicology report by the very person who performed the test and prepared the report. *See State v. Hughes*, 713 S.W.2d 58, 62 (Tenn. 1986) (by enacting Code section 55-10-410, the legislature intended to avoid any confrontation violation by providing that admissibility of test results are dependent on presence of laboratory technician who performed tests). Agent Ferguson was present at trial and testified; he was available for the full spectrum of confrontation by the defendant. Moreover, to the extent that the defendant is attempting to claim confrontation problems regarding Stewart and Whitson, that argument also fails. Stewart and Whitson played no role in analyzing the blood or preparing the report to which the defendant objects. Indeed, on the facts in the record, we find no hearsay statements attributable to Stewart or Whitson that raise any confrontation concerns.

### D. Violation of Code Section 55-10-406

The defendant's final complaint is in the nature of a request for this court to adopt a rule that absent satisfaction of all the statutory prerequisites of Code section 55-10-406(a)(1), blood evidence should be excluded. That section provides,

> Any person who drives any motor vehicle in the state is deemed to have given consent to a test for the purpose of determining the alcoholic or drug content of that person's blood; provided, that such test is administered at the direction of a law enforcement officer having reasonable grounds to believe such person was driving while under the influence of an intoxicant or drug, as defined in § 55-10-405. Any physician, registered nurse, licensed

practical nurse, clinical laboratory technician, licensed paramedic or, notwithstanding any other provision of law to the contrary, licensed emergency medical technician approved to establish intravenous catheters, or technologist, or certified and/or nationally registered phlebotomist who, acting at the written request of a law enforcement officer, withdraws blood from a person for the purpose of making such test, shall not incur any civil or criminal liability as a result of the withdrawing of such blood, except for any damages that may result from the negligence of the person so withdrawing. Neither shall the hospital nor other employer of the previously listed health care professionals incur, except for negligence, any civil or criminal liability as a result of the act of withdrawing blood from any person.

Tenn. Code Ann. § 55-10-406(a)(1) (2004).

In terms of the facts of his case, the defendant claims that the state failed to prove compliance with the provisions that specify who is authorized to withdraw blood at the request of a law enforcement officer. The defendant points to Officer Damewood's inability to specify the professional credentials of Mr. Stewart who drew the defendant's blood.

We decline the defendant's invitation to superimpose an exclusionary rule feature on section 55-10-406(a)(1). The state is not required to prove compliance with the statute as a prerequisite to admissibility. *See State v. Huskins*, 989 S.W.2d 735, 738 (Tenn. Crim. App. 1998) (statute's purpose not to carve out a rule of exclusion when the provisions of subsection (a)(2) have not been followed; officer's non-compliance with license suspension warning requirement does not warrant suppression of the defendant's blood alcohol test results); *State v. Gilbert*, 751 S.W.2d 454, 460 (Tenn. Crim. App. 1988) (state not required to prove blood sample drawn in compliance with § 55-10-406(a)(1)).

## IV. Sentencing

For his last issue, the defendant complains that he was improperly sentenced to four years as a Range I standard offender to be served in split confinement with six months in custody and the balance of the term on supervised probation. He challenges the application of enhancement and mitigating factors, the trial court=s failure to grant full probation, and the rejection of his application for diversion. We will address each contention in turn.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Ashby*,

823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the defendant. *Id*. In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely *de novo*. *Id*. If appellate review reflects that the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The defendant's Range I, four-year sentence for his merged aggravated assault conviction is a maximum sentence, exceeding the two-year presumptive sentence by two years. *See* Tenn. Code Ann. §§ 39-13-102(a)(2), (d)(1) (aggravated assault under subdivision (a)(2) is Class D felony), 40-35-112(a)(4) (2003) (establishing Range I, Class D felony sentences at two to four years). We have reviewed the transcript of the sentencing hearing in this case. The trial court's sentencing remarks were brief, quite truncated, and fail to reflect the required sentencing considerations. Accordingly, we shall proceed with a *de novo* review without a presumption of correctness.

At the sentencing hearing, the state had advocated application of two enhancement factors: (11) "[t]he defendant had no hesitation about committing a crime when the risk to human life was high," and (17) "[t]he crime was committed under circumstances under which the potential for bodily injury to a victim was great." Tenn. Code Ann. § 40-35-114(11), (17) (2003). On appeal, the state concedes that enhancement factor (17) is inapplicable pursuant to *State v. Imfeld*, 70 S.W.3d 698 (Tenn. 2002). Nevertheless, the state insists that enhancement factor (11) is "squarely applicable and supports the four-year sentence."

A case-by-case approach should be undertaken to determine whether an enhancement factor is applicable. *Id*. at 704; *State v. Winfield*, 23 S.W.3d 279, 283 (Tenn. 2000). By statute, an enhancement factor must be appropriate for the offense and not an essential element of the offense. Tenn. Code Ann. § 40-35-114 (2003).

Enhancement factor (11) may be applied when the defendant creates a high risk to the life of a person other than the victim. *State v. Bingham*, 910 S.W.2d 448, 452 (Tenn. Crim. App. 1995), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9 (Tenn. 2000). The victim, for sentencing purposes in this case, was Mr. Wright, but the defendant's conduct clearly placed Ms. Burke at risk. Even though the jury acquitted the defendant on the vehicular homicide charges naming Ms. Burke as a victim, a sentencing court may properly apply an enhancement factor based on facts underlying an offense for which a defendant has been acquitted, so long as the facts have been established in the record by a preponderance of the evidence. *See Winfield*, 23 S.W.3d at 283.

The defendant argues that enhancement factor (11) cannot be applied when, as in this case, the conviction offense is aggravated assault with a deadly weapon. The defendant cites to *State v. Hill*, 885 S.W.2d 357 (Tenn. Crim. App. 1994), for that proposition. *Hill*, however, does not create such a hard-and-fast rule. *Hill* provides in relevant part:

The trial court should not have considered factor [11], i.e., the [defendant] had no hesitation about committing a crime when the risk to human life was high. This factor is inherent in the offense of aggravated assault. As this Court said in *State v. Kevin L. Gaskill*, 1991 Tenn. Crim. App. LEXIS 529, Bradley County No. 285 (Tenn. Crim. App., Knoxville, June 26, 1991): "It is difficult to discern a situation in which an offense committed with a deadly weapon would not necessarily entail a risk to human life." Slip op. at 11. In addition, [the defendant's] wrath and vindictiveness was directed solely at Johnson. *The record is void of any evidence that individuals in close proximity were in danger of being injured.*

885 S.W.2d at 363 (citation omitted) (emphasis added); *see State v. Matthew DeLoss Larsen*, No. M2000-01675-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., Nashville, Oct. 12, 2001) ("[E]ven when the facts proving factor [11] likewise establishes an element of the offense, it may still be applied where the defendant creates a high risk to the life of a person other than the victim."); *State v. William Lewis Houston*, No. M1999-01430-CCA-R3-CD, slip op. at 12 (Tenn. Crim. App., Nashville, Dec. 7, 2000).

Accordingly, we reject the defendant's argument that enhancement factor (11) is not applicable to his merged aggravated assault conviction.

Regarding mitigating sentencing factors, the defendant insists that "[s]ubstantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense," Tenn. Code Ann. § 40-35-113(3) (2003); that "[t]he defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct," *id.* § 40-35-113(11); and that his lack of criminal record, remorse, and youthful age are mitigating factors, *id.* ' 40-35-113(13). In our opinion, nothing in the record supports the application of the first two mitigating factors. No grounds have been shown to excuse or justify the defendant's operation of his motor vehicle at an unlawful rate of speed on a two-lane section of road while in a highly inebriated condition. Nor are the circumstances of this case particularly unusual; the defendant chose to leave his residence, meet with friends, consume alcoholic beverages, and drive home. Furthermore, to the extent these factors may have some mitigation value, we believe that the leniency that the jury extended the defendant in connection with the charges involving Ms. Burke's death exhausts the efficacy of the factors. *See State v. Sanford L. Wilson*, No. 01C01-9708-CR-00319, slip op. at 4 (Tenn. Crim. App., Nashville, Sept. 29, 1998) (no *per se* prohibition against "double mitigation" of a sentence by applying a mitigating factor even though jury has extended leniency on the same basis; however, Adouble mitigation@ inappropriate if additional consideration of the relevant facts is not merited); *State v. Michael D. Frazier*, No. 03C01-9602-CR-00084, slip op. at 6-8 (Tenn. Crim. App., Knoxville, June 4, 1997).

On balance, we believe that sentencing enhancement factor (11) is entitled to significant weight in this case and that the defendant's remorse, age, and lack of criminal record, although shown, supply marginal mitigating weight. A four-year sentence in this case is

appropriate and justly deserved. *See State v. Michael T. Gilliam*, No. E1999-01112-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Knoxville, Apr. 12, 2000) (application of a mitigating factor does not guarantee the imposition of a less-than-maximum sentence, especially when the sentencing range is only one year); *State v. Samuel D. Braden*, No. 01C01-9610-CC-00457, slip op. at 14 (Tenn. Crim. App., Nashville, Feb. 18, 1998) (enhancement factors may be sufficient "to firmly embed the sentence in the ceiling," so as to resist the pull of a mitigating factor to reduce the sentence to a level less than the maximum).

The defendant further complains that he should have received full probation instead of split confinement. We disagree. To be sure, he was eligible for full probation. *See* Tenn. Code Ann. § 40-35-303(a) (2003). The determination of entitlement to full probation, however, necessarily requires a separate inquiry from that of determining whether a defendant is entitled to a less beneficent alternative sentence. *See Bingham*, 910 S.W.2d at 455. A defendant is required to establish his "suitability for full probation as distinguished from his favorable candidacy for alternative sentencing in general." *State v. Mounger*, 7 S.W.3d 70, 78 (Tenn. Crim. App. 1999); *see State v. Jimmy Ray Dockery*, No. E2004-00696-CCA-R3-CD, slip op. at 2 (Tenn. Crim. App., Nov. 30, 2004). A defendant seeking full probation bears the burden of showing that probation will "subserve the ends of justice and the best interest of both the public and the defendant." *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).

The defendant in this case has not shouldered his burden of demonstrating how probation will subserve the ends of justice and the best interests of both the public and the defendant. Rather, he assigns as error the trial court's statement that confinement was necessary to avoid depreciating the seriousness of the offense. *See* Tenn. Code Ann. § 40-35-103(1)(B) (2003). With regard to suitability for full probation, it is appropriate, however, to consider the circumstances of the offense, the defendant's potential or lack of potential for rehabilitation, whether full probation will unduly depreciate the seriousness of the offense, and whether a sentence other than full probation would provide an effective deterrent to others likely to commit similar crimes. *See State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996).

In summary, the split-confinement sentence imposed showed proper respect for the presumption that the defendant was a favorable candidate for alternative sentencing options in the absence of evidence to the contrary. *See* Tenn. Code Ann. § 40-35-102(6) (2003). We, thus, decline to disturb the sentence imposed.

The defendant's last sentencing complaint is that the trial court improperly and summarily dismissed his application for judicial diversion, *see* Tenn. Code Ann. § 40-35-313 (Supp. 2004), in connection with his aggravated assault conviction.[3] The defendant's motion seeking such relief was filed subsequent to sentencing and the entry of his judgments of conviction.

---

[3] As the defendant has correctly acknowledged, his DUI conviction is not eligible, as a matter of law, for diversionary treatment. *See* Tenn. Code Ann. § 55-10-403(b)(1) (2004).

We need not address the substantive merits of this claim because procedurally the trial court was not authorized to consider the application. That is, in *State v. Turco*, 108 S.W.3d 244 (Tenn. 2003), the supreme court, interpreting the terms of the judicial diversion statute, ruled that a trial court does "not have statutory authority for ordering judicial diversion after an adjudication of guilt or imposition of sentence." *Id*. at 248. Consequently, we reject this claim.[4]

Before concluding our discussion and rulings concerning the defendant's sentence, we feel obligated to note that on April 15, 2005, the Tennessee Supreme Court released its opinion in *State v. Edwin Gomez & Jonathan S. Londono*, ___ S.W.3d ___, No. M2002-01209-SC-R11-CD (Tenn., Nashville, Apr. 15, 2005), *petitions for reh'g denied*, (May 18, 2005). In that decision, our supreme court held that Tennessee's sentencing scheme does not violate the Sixth Amendment right to trial by jury, as expounded by the United States Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), *Blakely v. Washington*, 542 U.S. ___, 124 S. Ct. 2531 (2004), and *United States v. Booker*, 543 U.S. ___, 125 S. Ct. 738 (2005). Pursuant to *Edwin Gomez*, the defendant's sentencing is not infirm on Sixth Amendment grounds.

## CONCLUSION

Summarizing, we hold that the convicting evidence is sufficient to support the jury's verdict of guilt on the charge of aggravated assault, that no evidentiary error resulted from the trial court's exclusion of the defendant's computer visualization, that the results of the blood toxicology test were properly admitted, and that the defendant's sentence is not excessive. Accordingly, the judgment of the trial court is hereby affirmed.

---

[4] In *Turco*, the trial court had granted the defendant's Rule 35(b) motion to change his one-year suspended sentence to judicial diversion. *See* Tenn. R. Crim. P. 35(b) ("The trial court may reduce a sentence upon application filed within 120 days after the date the sentence is imposed or probation is revoked. . . . A modification can only be as to any sentence the court could have originally imposed."). The supreme court first ruled that the trial court lacked authority to act because judicial diversion is not a *sentence* and, therefore, not a "*sentence* the court could have originally imposed," as required by Rule 35. *Id*. (emphasis added). Second, the supreme court ruled that judicial diversion was not available because there had been a prior adjudication of guilt, entry of judgment of conviction, and sentence of incarceration, whereas, by statute, judicial diversion is granted "without entering a judgment of guilty." Tenn. Code Ann. § 40-35-313(a)(1)(A) (Supp. 2004).

Pursuant to *Turco*, the previously existing judgment of conviction in the present case precluded consideration of the defendant's later-filed motion for judicial diversion. Furthermore, even though the judgment of conviction was not final at the time the defendant filed his motion, he neither cited nor pleaded any procedural avenue or statute authorizing the trial court to vacate the existing judgment to permit consideration of his bid for diversion. Unlike a trial court's authority to *amend* a judgment during the time that it retains jurisdiction, *see generally State v. Pendergrass*, 937 S.W.2d 834, 837 (Tenn. 1996), the authority to *vacate* a judgment is narrowly prescribed, *see Turco*, 108 S.W.3d at 248 & n.8 (noting that Rule 36(b) does not authorize vacating a judgment of conviction; further noting that a judgment may be vacated under Rule 33 in connection with granting a new trial, under Rule 32(f) in connection with withdrawal of guilty plea, under the post-conviction statutes in connection with granting relief, and under *habeas corpus* and/or error *coram nobis* rules in connection with granting relief).

-25-

_____

JAMES CURWOOD WITT, JR., JUDGE